1  STEVEN A. BLUM (CA SBN 133208)
   blum@blumcollins.com
2  CRAIG M. COLLINS (CA SBN 151582)
   collins@blumcollins.com
3  GARY HO (CA SBN 229995)
   ho@blumcollins.com
4  BLUM | COLLINS LLP
   707 Wilshire Boulevard, Suite 4880
5  Los Angeles, California 90017
   Telephone (213) 572-0400
6  Facsimile (213) 572-0401

7  *(continued on page ii)*

8  Attorneys for Plaintiffs
9  Barbara L. Schramm and Steven L. Weinstein

```
FILED
CLERK, U.S. DISTRICT COURT

JAN 19 2012

CENTRAL DISTRICT OF CALIFORNIA
BY              DEPUTY
```

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                    **WESTERN DIVISION**

14

15  BARBARA L. SCHRAMM,                  Case No. CV09-9442-JAK (FFMx)
    an individual, and STEVEN L.
16  WEINSTEIN, an individual,            **PLAINTIFFS BARBARA L.**
    individually and on behalf of all others  **SCHRAMM'S AND STEVEN L.**
17  similarly situated,                  **WEINSTEIN'S CLASS ACTION**
                                         **SECOND AMENDED**
18              Plaintiffs,              **COMPLAINT FOR: (1)**
                                         **INTENTIONAL**
19          vs.                          **MISREPRESENTATION;**
                                         **(2) CONCEALMENT;**
20  JPMORGAN CHASE BANK, N.A.,           **(3) PROMISE MADE WITHOUT**
    a banking corporation, and CHASE     **INTENT TO PERFORM;**
21  HOME FINANCE, LLC, a limited         **(4) RESCISSION; (5) NEGLIGENT**
    liability company,                   **MISREPRESENTATION OF**
22                                       **FACT; (6) VIOLATIONS OF THE**
            Defendants.                  **UNFAIR COMPETITION ACT,**
23                                       **INCLUDING PERMANENT**
                                         **INJUNCTION; AND**
24
                                         **(7) UNJUST ENRICHMENT**
25

26

27                                       **CLASS ACTION**
                                         **DEMAND FOR JURY TRIAL**
28

─────────────────────────────────────────────────────────
Case No. LA CV09-09442-JAK          Plaintiffs' Second Amended Complaint

1

2

Attorneys for Plaintiffs (*continued from page i*)

3

JOHN A. GIRARDI (CA SBN 54917)
jgirardi@girardikeese.com
GIRARDI & KEESE

4

1126 Wilshire Boulevard

5

Los Angeles, California 90017
Telephone (213) 977-0211

6

Facsimile (213) 481-1554

7

JOHN S. PETERSON (CA SBN 101215)

8

jsp@petersonlawgroup.com
PETERSON LAW GROUP PC

9

633 West 5th Street, Suite 2800
Los Angeles, California 90071

10

Telephone (213) 236-9720
Facsimile (213) 236-9724

11

12

Attorneys for Plaintiffs
Barbara L. Schramm and Steven L. Weinstein

13

14

15

16

17

18

19

20

21

22

23

24

25

26

28

1    Plaintiffs Barbara L. Schramm and Steven L. Weinstein, individually, and on

2    behalf of all others similarly situated, allege the following on information and belief:

3                                    **SUMMARY**

4        1.    Plaintiffs bring this action pursuant to various provisions of the California

5    Civil Code and California common law to recover damages that Plaintiffs and members

6    of the class, as defined below, have sustained due to the violations of Defendants as

7    herein alleged.  Plaintiffs also bring this action pursuant to Cal. Bus. & Prof. Code §§

8    17203 and 17204 to obtain injunctive and restitutionary relief from Defendants due to

9    their violations of Bus. & Prof. Code §§ 17200 *et seq.* (the "Unfair Competition Act").

10       2.    Defendants have removed this action to Federal Court and claim this Court

11   has jurisdiction under the Class Action Fairness Act.  Plaintiffs contend that this Court

12   lacks jurisdiction because of exceptions in the Class Action Fairness Act known as the

13   "home state exception" and the "local controversy exception," which turn in part on the

14   citizenship of the putative class members, and the "securities" exception.  The home

15   state exception requires federal courts to "decline to exercise [CAFA] jurisdiction"

16   when, among other things, "greater than two-thirds of the members of all proposed

17   plaintiff classes in the aggregate are citizens of the State in which the action was

18   originally filed." 28 U.S.C. § 1332(d)(4)(a)(i)(I). And the local controversy exception

19   requires federal courts to "decline to exercise [CAFA] jurisdiction" where "two-thirds

20   or more of the members of all proposed plaintiff classes in the aggregate . . . are citizens

21   of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B).

22   Plaintiffs are informed and believe that greater than two-thirds of the members of all

23   proposed plaintiff classes in the aggregate are citizens of California.  Plaintiffs also

24   contend that the Court lacks jurisdiction over a class action that "solely involves a claim

25   . . . that relates to the rights, duties (including fiduciary duties), and obligations relating

26   to or created by or pursuant to any security . . . ." 28 U.S.C. § 1332(d)(9)(C), and

28   Plaintiffs further contend that the loan instruments which are the subject of this action

1  are securities. Each Defendant maintains an office, transacts business, is found in or

2  has an agent within the State of California, and, more particularly, within the County of

3  Los Angeles, and thus absent jurisdiction under the Class Action Fairness Act this

4  Court would lack jurisdiction because there is neither a federal question nor full

5  diversity. Plaintiffs are informed and believe and thereon allege that Defendants each

6  do more business in the County of Los Angeles than in any other county in the State of

7  California.

8      3.    The unlawful acts committed and the conduct undertaken pursuant to the

9  conspiracy alleged herein has had and continues to have, a direct effect on consumers

10  within the State of California and the County of Los Angeles.

11     4.    As used herein, the terms "person" or "persons" have the same meaning as

12  set forth in Section 17201 of the California Business and Professions Code.

13                                    **PLAINTIFFS**

14     5.    Plaintiffs Barbara L. Schramm and Steven L. Weinstein are residents of

15  Oakland, California. Plaintiffs and the Class members they represent purchased

16  adjustable rate mortgages ("ARM Loans") from Defendants.

17                                    **DEFENDANTS**

18     6.    Defendant JPMorgan Chase Bank, N.A. ("JPMORGAN CHASE BANK")

19  is a banking corporation chartered under the laws of the United States of America with

20  its principal place of business in Iselin, New Jersey. JPMORGAN CHASE BANK is

21  liable for all of the unlawful conduct alleged herein.

22     7.    Defendant Chase Home Finance, LLC ("CHF LLC") is a limited liability

23  company organized under the laws of the State of Delaware with its principal place of

24  business in Iselin, New Jersey. CHF LLC is a successor-in-interest by merger to Chase

25  Manhattan Mortgage Corporation ("CHASE MANHATTAN"), formerly a New Jersey

26  corporation. CHF LLC is liable for all of the unlawful conduct alleged herein.

28

8.    This action pertains to various illegal lending practices that Defendants and/or their predecessors-in-interest engaged in during the marketing and sale of adjustable rate mortgages to Plaintiffs and the Class members, as defined below.

## CLASS ACTION ALLEGATIONS

9.    Plaintiffs bring this suit as a class action pursuant to Code Civ. Proc. § 382 on behalf of themselves and as representatives of a class ("Class") composed of and defined as follows:

> All persons who obtained ARM Loans in the State of California from Defendants secured by a residential single-family dwelling place or condominium located in the State of California, and received loan disclosures stating that they would be charged an initial interest rate that was the sum of the then current index and a set margin but instead were charged an initial interest rate that was higher than the sum of the then-current index and margin as specified in the loan disclosures and who either have not yet discovered this or discovered it during the Class Period which shall be the maximum period of time allowable under the longest available limitations period under applicable laws.

10.    This action has been brought and may be properly maintained as a class action pursuant to Code Civ. Proc. § 382 for the following reasons:

11.    The Class is ascertainable and there is a well-defined community of interest among the Class members;

12.    Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of class members is at least in the thousands and Class members are so numerous and geographically dispersed across the State of California that joinder of all class members is impracticable;

13.    Plaintiffs' claims are typical of the claims of the Class members.  Except as to the amount of damages each member of the Class has sustained, all other questions of law and fact are common to the Class members, including, but not limited to, the

conspiracy, the acts of fraud, misrepresentation and unfair competition herein alleged, and the effects of such violations.

14.    Questions of law or fact which are common to the Class members predominate over any questions affecting only individual Class members. Among the questions of law and fact common to the class are the following:

a.    whether Defendants engaged in a conspiracy among themselves to defraud Plaintiffs and the Class members and to otherwise engage in unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices;

b.    the duration and extent of the conspiracy alleged in this Second Amended Complaint;

c.    whether Defendants' acts, omissions, misrepresentations, practices and/or non-disclosures regarding the sale of ARM Loans were unlawful;

d.    whether Defendants' conduct caused injury to Plaintiffs and the Class members;

e.    whether Defendants' conduct violates Bus. & Prof. Code §§ 17200 *et seq.*; and

f.    the appropriate nature of class-wide equitable relief.

15.    Plaintiffs will fairly and adequately protect the interests of the Class members in that Plaintiffs have no interests that are antagonistic to other Class members and have retained counsel competent and experienced in the prosecution of class actions of this type to represent themselves and the Class members;

16.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class

1  members is impractical. The damages suffered by individual Class members are

2  relatively small, given the expense and burden of individual prosecution of the claims

3  asserted in this litigation. Thus, absent the availability of class action procedures, it

4  would not be feasible for Class members to redress the wrongs done to them. Even if

5  the Class members could afford individual litigation, the court system could not.

6  Further, individual litigation presents the potential for inconsistent or contradictory

7  judgments and would greatly magnify the delay and expense to all parties and to the

8  court system. Whatever difficulties may exist in the management of the class action

9  will be greatly outweighed by the benefits of the class action procedure, including, but

10 not limited to, providing claimants with a method for redress of claims that may

11 otherwise warrant individual litigation. Therefore, the class action device presents far

12 fewer case management difficulties and will provide the benefits of unitary

13 adjudication, economy of scale and comprehensive supervision by a single court; and

14     17.    In the absence of a class action, Defendants would be unjustly enriched

15 because they would be able to retain the benefits and fruits of their wrongful conduct.

16

17

18

19

20

21

22

23

24

25

26

28

**FACTUAL ALLEGATIONS**

18.    At all relevant times until the present, Defendants and CHASE MANHATTAN were in the business of originating and servicing mortgage real estate loans secured by real estate mortgages. As real estate mortgage lenders, Defendants and CHASE MANHATTAN were required under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 *et seq.* and Regulation X, 24 C.F.R. § 3500, as amended ("RESPA") and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and Regulation Z, 12 C.F.R. § 226, as amended ("TILA"), to make certain, disclosures of anticipated charges and the final cost of the loans to their borrowers.

19.    To evidence their compliance with RESPA and TILA as a condition for closing five-, seven-, and ten-year ARM Loans, Defendants and CHASE MANHATTAN have required all borrowers of said ARM Loans, including Plaintiffs and Class members, to acknowledge that they have received certain disclosures. Defendants require borrowers to read and sign a form document entitled "5/1, 7/1 and 10/1 Non-Convertible Fixed/Adjustable Rate Loan Disclosure (Non-Construction)" (hereinafter the "5/1 ARM Disclosure"). Attached hereto as Exhibit A is an example of a true and correct unsigned copy of a 5/1 ARM Disclosure.

20.    The Defendants have done the same thing with shorter-term fixed-rate loans. As a condition for closing one- and three-year ARM Loans, Defendants have required all borrowers of said ARM Loans, including Plaintiffs and Class members, to read and sign a similar form document entitled "1/1 & 3/1 Non-Convertible ARM Disclosure (Non-Construction)" (the "3/1 ARM Disclosure"). Attached hereto as Exhibit B is a true and correct signed copy of a 3/1 ARM Disclosure.

1        Summary of the Misleading Statements

2        21.    This case is about the misleading nature of these disclosure forms and also
3    the promissory notes that borrowers signed.  The Defendants deceived the Plaintiffs and
4    Class members about the interest rate that they would pay in the initial loan period—
5    *i.e.,* the period before the first adjustment of the interest rate (which could be a period
6    of three years, five years, or something else.).

7        22.    The Defendants informed the Plaintiffs and Class members that their
8    "initial Interest Rate" would be the sum of an Index plus a Margin, or possibly some
9    rate *less* than this sum, but in truth the Defendants charged the Plaintiffs and Class
10    Members an initial interest rate <u>higher</u> than the sum of the Index and the Margin.  The
11    Defendants' conduct was fraudulent, deceptive and unfair.

The Section Titled "How Your Interest Rate is Determined"

Does not State how the Interest Rate is Determined

14        23.    Section I.A. of the 5/1 ARM Disclosure is entitled **"How Your Interest
15    Rate is Determined."**  Based on its title, one would reasonably believe this section of
16    the disclosure statement would describe how one's interest rate is determined.

17        24.    Section I.A. states in relevant part:

19        Your interest rate will be based on the weekly average yield on
         United States Treasury securities adjusted to a constant maturity of 1
20        year (the "Index") plus an amount called a "Margin."  Ask us for our
         current Margin and interest rate. . . .  The Index and the Margin will
21        be specified in the promissory note (the "Note") which evidences
22        your ARM loan. . . .

23        The interest rate you pay until the first Rate Change Date is called
24        the "Initial Interest Rate."

1    25.    This section is misleading in two ways.  First, since this section is titled
2  **"How Your Interest Rate is Determined,"** and since it states only that the interest
3  rate is the sum of the Index and the Margin, and nowhere mentions that Defendants will
4  arbitrarily charge an interest rate during the initial period that is <u>higher</u> than the sum of
5  the Index and the Margin, it is materially misleading.

6    26.    Second, this section is misleading because it purports to explain how the
7  interest rate is determined but in fact omits any mention of how the Defendants actually
8  determined the interest rate in the initial period.  The Defendants concealed their actual
9  basis for setting the initial interest rate, as explained more in paragraph 30 of this
10  Second Amended Complaint below.

11    The Section Titled "How Your Interest Can Change" is Materially Misleading

12    27.    Section I.B. of the 5/1 ARM Disclosure is entitled **"How Your Interest**
13  **Rate Can Change."**  It explains several items including how and when Defendants will
14  adjust the interest rate at each future Rate Change Date, limitations (or "caps") on any
15  increase or decrease in the interest rate on the change dates, the life-of-the-loan cap and
16  floor on the interest rate, and the rounding factor.  In relevant part, this section also
17  alerts a borrower that the initial Interest Rate may be "discounted":

18
19    Your initial Interest Rate may be discounted and will not be tied to
     the Index.  It will be adjusted to the sum of the then-current Index
20    plus the Margin at the first Rate Change Date, subject to the interest
     rate caps explained above.  Ask us about the amount of the current
21    interest rate discount.
22

23    28.    This is misleading in three ways.  First, since this section states that the
24  initial interest rate may be "discounted" from the Index plus Margin rate but omits to
25  mention that Defendants will arbitrarily charge an interest rate during the initial period
26  that is <u>higher</u> than the sum of the Index and the Margin, it is materially misleading.
28

Consistent with the common understanding and industry practice of the word "discount," the Defendants' ARM Disclosures conveyed to Plaintiffs and the Class members that the Initial Interest Rate might be *less* than the sum of the Margin and the current value of the Index but did not reasonably convey the information that the Initial Interest rate could be <u>higher</u> than the sum of the current Index and the Margin.  No one expects a "discounted" rate to be <u>higher</u> than the regular rate.

29.    Second, this disclosure about the *initial* interest rate possibly being discounted is buried under the incorrect heading "How Your Interest Rate Can Change" instead of where it belongs under the heading "How Your Interest Rate is Determined."

30.    Third, the section promises that the interest rate *after* the first rate change date will be "subject to the interest rate caps explained above"—in other words, the interest rate in the second loan period will not exceed the Index plus the Margin plus the maximum adjustment allowed on any single rate change date.[1]  In reality, however, by illegally boosting the interest rate in the initial loan period, the Defendants boosted themselves into charging illegally higher interest rates in the second and subsequent loan periods as well.  This was deceptive and misleading.

31.    This can be illustrated by example.  Assuming that the maximum increase on any single rate change date is 2 percentage points (as it was in the case of the Plaintiffs' loan), Section I.B. of the 5/1 ARM Disclosure promises that the interest rate after the first rate change date would not exceed the Index plus Margin plus 2 percentage points.  For example, if the sum of the Index plus the Margin in the initial

---

[1]    Section 4 of both the 5/1 ARM Note and 3/1 ARM Note provides that as of the first Rate Change Date (and every 12 months thereafter) the interest rate on the Notes would be adjusted to an amount equal to the then-current Index (which might then be higher than at the outset of the loan) plus the margin, provided that resulting interest rate for the next loan period could not exceed the interest rate for the previous loan period by more than a certain number of percentage points (typically, two or three).  In other words, the interest rate could rise on the rate change date but would be capped at, say, an increase of two percentage points.

period yielded an interest rate of 3 percent, and the cap on rate changes were 2 percent, the borrowers would expect that the interest rate after the first change date (*i.e.,* in the second loan period) could not exceed 5 percent. However, if the Defendants arbitrarily set a interest rate during the initial period exceeding the Index plus the Margin (in violation of the disclosure statements) of, say, 4 percent, the Defendants would adjust the interest rate on the first rate change date by the 2 percentage point cap, and end up charging 6 percent in the second loan period instead of the maximum 5 percent promised in the disclosure statements. In this manner, the Defendants overcharged the Plaintiffs and the Class members not only in the initial loan periods but also in subsequent loan periods as well.

32.     The 3/1 ARM Disclosure for shorter term loans makes the exact same disclosures but refers to a different index (*i.e.,* the average of interbank offered rates for one-year dollar-denominated deposits in the London market, or the "LIBOR").

<u>The Defendants Overcharged the Plaintiffs</u>

33.     A reasonable person reading either disclosure statement would conclude that the borrower would pay interest on his or her loan at a rate equal to the Index plus the Margin, or perhaps some discounted rate during the initial period. For the Plaintiffs' 3/1 ARM Loan, for example, the Index was the LIBOR Rate and the Margin was fixed at 2.25 percent.[2] The Plaintiffs were charged an initial interest rate of 3.875 percent.

---

[2]     The amount of each borrower's Margin is stated in the promissory notes. Either simultaneously with or shortly after giving them either the 5/1 ARM Disclosure or 3/1 ARM Disclosure and prior to the loan closing, Defendants required borrowers, including Plaintiffs and members of the Class, to sign a "Fixed/Adjustable Rate Note" and a "Fixed/Adjustable Rate Rider." Examples of true and correct copies of the notes and riders employed by Defendants, are attached hereto as Exhibits C and D, respectively, and shall hereinafter be collectively referred to as the "ARM Note." The amount of the "Margin," which is referenced in the ARM Disclosures, is stated in Section 4(C) of the ARM Notes.

1   Thus, they naturally would have assumed at the time that the LIBOR Rate must have
2   been 1.625 percent (*i.e.,* their initial interest rate of 3.875 percent minus the margin of
3   2.25 percent).

4       34.    In fact, however, though unbeknownst to the Plaintiffs at the time, the
5   value of the LIBOR index referenced in the 3/1 ARM Disclosure as of May 13, 2003,
6   which was the date of the 3/1 ARM Note, was only 1.27 percent, not the 1.625 percent
7   necessary to yield an initial interest rate of 3.875 percent. In effect, Defendants secretly
8   padded the LIBOR rate (by a factor of almost 30 percent) to create an artificially high
9   initial interest rate.

10      35.    If the Defendants had in fact calculated the Plaintiffs' initial interest rate as
11  they said they would do so, the Defendants would have added the index of 1.27 percent
12  and the margin of 2.25 percent which, when rounded, would have yielded an initial
13  interest rate of 3.50 percent. By charging the Plaintiffs 3.875 percent interest in the
14  initial period instead of 3.50 percent, and by overcharging all of the Class members in
15  the same manner, the Defendants reaped a ton of money which they no doubt used to
16  pay multi-million dollar bonuses to their Wall Street executives.

17      36.    The initial interest rate as specified in the 3/1 ARM Disclosure was based
18  on factors that were never disclosed and were unknown to Plaintiffs and the Class
19  members. Unknown and undisclosed to Plaintiffs and the Class members, Defendants
20  have charged, and continue to charge, Plaintiffs and the Class members initial interest
21  rates (and interest rates in subsequent loan periods) that are _higher_ than the rate
22  disclosed in the ARM Disclosures.

23

24              **TIME AND MANNER OF PLAINTIFF'S**
25              **DISCOVERY OF CAUSE OF ACTION**

26      37.    **Time and manner of discovery:** In about December 2006, Plaintiff
28  Weinstein began shopping for a loan to replace his Chase loan since he knew that his

Chase loan would likely adjust upward on the next annual adjustment date in May 2007.  Before the interest rate would adjust in May 2007, he wanted to know if some other lender might offer a better rate in May 2007.

38.    As part of his investigation in late 2006, Plaintiff Weinstein reviewed, among other items, the April 25, 2006 rate-change notice that he had received from Defendant CHF LLC before the first adjustment date in May 2006 (*i.e.,* he had taken out a three-year fixed, and then one-year adjustable, loan in May 2003, and this loan had adjusted for the first time in May 2006).  Plaintiff Weinstein never received any rate-change notice for the 5/1 ARM note that he obtained from the Defendants in October 2001, because he refinanced prior to the first adjustment date with the 3/1 ARM note.

39.    The April 2006 rate-change notice included the following table, which is jammed in the middle of the rate-change notice, among much more important paragraphs telling Plaintiffs about when their interest rate would adjust, and what their new monthly payment would be:

| Interest rates are determined as follows: | | | |
|---|---|---|---|
| Previous Index | 1.38400% | Current Index | 5.36063% |
| Margin | 2.25000% | Margin | 2.25000% |
| Previous Interest Rate | 3.87500% | New Interest Rate | 5.87500% |

40.    The table begins with this language "Interest rates are determined as follows…"  In its table, Defendants placed numbers in a vertical column that strongly (and falsely) suggests that the "previous interest rate" was "determined" by adding the applicable index to the margin.  This is false – Plaintiffs' initial interest rate was not the

1    sum of the index and margin.  So this rate-change notice is simply another attempt by
2    Defendants to cement borrowers' mistaken belief that their initial interest rate had been
3    the sum of the index and the margin.

4        41.   Even if a borrower somehow did his or her own math to check Defendants'
5    arithmetic in the rate change notice, spotted the discrepancy in the numbers, and
6    calculated that it could not be attributed to the stated rounding factor of .125 %, he or
7    she would have no reason to suspect that the discrepancy is the result of fraud, rather
8    than mere clerical error.

9        42.   Kathie Ward, the Chase executive responsible for managing the "delivery
10   mechanism" for policies and procedures and the person most knowledgeable on the
11   contents of the interest rate disclosure forms at issue, testified in her deposition in this
12   case that even she did not understand why the rate-change notice table presented the
13   "previous index", "margin" and "previous interest rate" data to borrowers (see
14   paragraph 39), since the "previous interest rate" (or "initial interest rate") was in fact
15   *not* tied to any index.

16       43.   When Plaintiff Weinstein received the April 25, 2006 rate-change notice
17   for the 3/1 ARM note, he was generally aware that market interest rates for home loans
18   had risen significantly in the three years since he obtained his loan in May 2003.  He
19   reviewed the April 25, 2006 rate-change notice only to confirm that his interest rate
20   would be adjusting upward on the May 2006 rate change date but not by more than the
21   two percentage point maximum change allowed by his loan documents on any rate
22   change date.  The April 25, 2006 rate-change notice in fact confirmed to Plaintiff
23   Weinstein that his previous interest rate was 3.875 percent, and that his new interest
24   rate would go up by the full two-percentage point adjustment allowed by the terms of
25   his loan documents.  His new interest rate would be 5.875 percent.  Plaintiffs were
26   unaware at this time that because Defendants had illegally padded the initial interest
28

1  rate, Defendants improperly had bootstrapped themselves into charging a higher
2  adjusted rate beginning May 2006 as well.

3       44.    In 2006, Plaintiff Weinstein also saw in the notice that he received from
4  Defendant CHF LLC that the current *index* (Libor) was 5.36063 percent and his margin
5  was 2.25 percent which meant that, if not for the two percentage point cap on any single
6  increase, his interest rate would have adjusted in May 2006 to a significantly higher rate
7  (*i.e.,* it would have been 7.61063 percent, but Plaintiff Weinstein did not actually
8  perform this calculation at this time).  Plaintiff Weinstein thus concluded that,
9  commencing with the rate change in May 2006, Plaintiffs would be paying an interest
10 rate that was nearly two full percentage points less than any then-available market rate
11 loan that they might obtain to pay off and replace this loan.  In other words, Plaintiff
12 Weinstein assumed that any replacement loan would be at the rate of Libor plus 2.25
13 percent, or something close to it, just as the loan he had obtained from Defendants in
14 May 2003 was at the rate of Libor plus 2.25 percent (except for the concealed padding
15 of that initial interest rate which Plaintiffs didn't know at the time and which is the
16 subject of this Second Amended Complaint).  Thus, it made no sense for Plaintiff
17 Weinstein in April or May 2006 to investigate his current loan or shop for replacement
18 loans any further.  No reasonable person at the time would have conducted any further
19 investigation of the existing loan until near the May 2007 adjustment date.  Once
20 Plaintiff Weinstein determined that his interest rate beginning May 2006 would
21 continue to be significantly below the market rate of interest at the time, Plaintiff
22 Weinstein had no further interest in and paid no further attention to loan-related
23 matters.

24      45.    In the back of his mind, however, Plaintiff Weinstein concluded that if his
25 loan were to adjust upward again at the second rate change date in May 2007 by the full
26 two percentage points allowed under his loan documents, it might then be fully adjusted
27 to a market rate.  Plaintiff Weinstein concluded that he might very well begin paying at

1    that time an interest rate that was equal to or possibly higher than he would pay in any

2    possible replacement loan.  Thus, in April or May 2006, Plaintiff Weinstein made a

3    mental note to shop around for possible replacement loans sufficiently in advance of the

4    May 2007 rate change date to determine whether his loan with Defendants would still

5    remain the most economical financing for him and Schramm after the May 2007

6    adjustment, or whether he should refinance it before being hit with the adjustment.

7        46.    In about December 2006, Plaintiff Weinstein began the process of

8    comparing his Chase loan with other loans available in the marketplace.  It was at this

9    time or later that he learned that Defendants had charged him an initial interest rate that

10   *exceeded* the sum of the index and the margin.  Plaintiff Weinstein at this time informed

11   Plaintiff Schramm of this discovery.

12       47.    Plaintiffs did not discover the Defendants' concealments and

13   misrepresentations earlier because Plaintiffs believed at the time of their initial

14   transactions that Defendants were reputable companies who would not engage in

15   dishonest or misleading conduct.  Plaintiffs also believed that applicable disclosure

16   laws would require Defendants to clearly state the interest rates that they were charging

17   and the basis on which they were calculated, and believed that the Defendants would

18   follow those laws.  Since the Defendants never stated that they were charging Plaintiffs

19   an interest rate in excess of the sum of the index and the margin, Plaintiffs had no

20   reason to suspect that they would be paying an interest rate that was higher than the

21   sum of the index and the margin.  As explained above, Plaintiffs did no further

22   investigation of their loan because the rate that they were paying fell below the market

23   rate for a replacement loan sometime before the first adjustment date of May 2006, and

24   it made no economic sense for Plaintiffs to consider replacing the loan until shortly

25   before the May 2007 adjustment date.

26

28

## DEFENDANTS FRAUDULENTLY CONCEALED
## PLAINTIFFS' CAUSES OF ACTION

48.    After Plaintiffs learned in December 2006 that Defendants had charged them an initial interest rate that *exceeded* the sum of the index and the margin, they naturally believed that this must have been the result of a mistake by Defendants, rather than a deliberate scheme to deceive.  Plaintiff Weinstein believed that if he could explain to Defendants that they had overcharged him, they would recognize that a mistake had been made, correct it, refund the overcharges, and possibly have the public relations department send a letter apologizing for the error.

49.    Instead, after Plaintiffs informed Defendants of the overcharge, Defendants engaged in additional fraud to mislead Plaintiffs into thinking that the overcharge was the result of a clerical error, not a fraud.  Plaintiffs did not discover the Defendants' concealments and misrepresentations until May 2007 because the Defendants actively concealed their wrongdoing to prevent the Plaintiffs from suing in time.

50.    For weeks after Plaintiffs made their first inquiries to Defendants in December 2006, Defendants didn't respond, then falsely promised to respond but didn't, and gave the excuse that they were referring the matter to the "appropriate department."  When they did respond, they falsely claimed they had misplaced Plaintiff Weinstein's correspondence and asked him to send it again.

51.    On February 8, 2007, Defendants finally sent Plaintiffs a substantive response stating that, "Your index (1-Year LIBOR) is added to your margin of 2.2500% to determine your next interest rate value."  While the letter explained how the "next interest rate value" would be calculated, it concealed how the initial interest rate was calculated.  The letter evaded Plaintiffs' question on why their initial interest rate exceeded the sum of the index and margin.

52.    The author of the letter, Octavia Cox, later told Mr. Weinstein falsely that she could not answer his questions on the initial interest rate. Ms. Cox was an ARM Analyst in Chase's Special Servicing Department. Ms. Cox directed Mr. Weinstein to contact the Research Department of CHF, LLC. On February 16, 2007, Mr. Weinstein wrote a letter to the Research Department. Mr. Weinstein's letter said, in relevant part, "… I would appreciate this department correcting the interest and arranging to refund to me the overpaid interest." Because Ms. Cox evaded Mr. Weinstein's question about how the initial interest rate was calculated, Mr. Weinstein still thought he only had an innocent error on his hand (as opposed to a deceptive scheme perpetrated by Defendants), and therefore, rather than running to court, Mr. Weinstein continued to communicate with Defendants' representatives to seek a refund and the correction of his rate.

53.    Ten days later, on February 26, 2007, Defendants sent Mr. Weinstein another letter saying that they were again "forwarding" his request to the "appropriate department."

54.    On March 14, 2007, Mr. Weinstein finally spoke to a woman named Tenisa in CHF, LLC's Research Department, who asked Mr. Weinstein to send his interest rate disclosures to the Defendants. Mr. Weinstein faxed the disclosures to Defendants on the same day. On or about April 13, 2007, Mr. Weinstein received a letter from Vicky Clayton, a Senior ARM Analyst from the Alternative Instruments Department at CHF, LLC. Ms. Clayton's letter expressly stated that Plaintiffs' initial interest rate was in fact based on the sum of the index and margin: "The initial interest rate *was based on an index and margin* other than the ones used to calculate your rate changes." This was false. Ms. Clayton's statement is directly contradicted by Mr. Reuscher's May 2007 letter and the deposition testimony of Kevin Kelleher (the Chase executive in charge of setting Defendants' interest rates) – both now say that the initial interest rate was never tied to the index.

55.    On April 20, 2007, Mr. Weinstein sent his interest rate disclosures to the Defendants (addressed to Ms. Clayton) for the second time. Ms. Clayton then referred Mr. Weinstein to Chris Beal, a mortgage consultant in CHF, LLC's Alternative Instruments Department. Mr. Weinstein spoke with Mr. Beal on the morning of April 25, 2007. Like Ms. Clayton, Mr. Beal falsely told Mr. Weinstein that the initial interest rate was based on the sum of the index and margin, and explained that Mr. Weinstein's rate was adjusted higher because he did not pay any points.

56.    Because of Ms. Clayton and Mr. Beal's further misrepresentation and concealment, Plaintiffs did not discover their cause of action until May 2007, when Rodney K. Reusher, Assistant Vice President, Legal and Compliance Department for Defendant CHF LLC, wrote a letter to Plaintiffs informing them that the initial interest rate as specified in the 3/1 ARM Disclosure was intentionally *higher* than the sum of the index and the margin – it was not a mere error.

57.    Mr. Reusher's letter said that the initial interest rate as specified in the 3/1 ARM Disclosure was based on factors that were never disclosed to Plaintiffs:

> "The initial loan pricing, which includes any combination of interest rate, points, and other origination fees that Chase quotes to prospective applicants, is determined internally and may take into account various factors, such as competitor pricing for similar loan products, internal cost of funds, customer creditworthiness, etc. This applies to both fixed interest rate and adjustable interest rate loan products."

58.    Although even Mr. Reusher's letter was somewhat evasive (stating the initial interest rate was "independent of" and "unrelated to" the sum of the index and the margin), Plaintiffs inferred that the initial interest rate was *higher* than the sum of the index and the margin, and that this was how the Defendants had planned it. Mr. Reusher's May 2007 letter disclosed ***for the first time*** that the initial interest rate was based on factors that had never been disclosed and which Plaintiffs never previously

1    knew or suspected.  Before receiving Mr. Reusher's May 2007 letter, Plaintiffs lacked

2    actual, presumptive or constructive knowledge of any facts sufficient to put them or any

3    reasonable person on inquiry of these matters.  Lastly, Mr. Reuscher continued to say

4    that Defendants did not have the interest rate disclosures provided to Plaintiffs upon the

5    origination of their loans, and asked Mr. Weinstein to send Defendants a copy (even

6    though Mr. Weinstein had already done so twice).

7        59.    Defendants did not fully come clean until Kevin Kelleher admitted during

8    his deposition in this case that Chase's initial interest rates are not the sum of the index

9    and margin, have never been lower than the sum of the index and margin, and have

10   never been tied to the index.

11       60.    In summary, even though Plaintiffs first complained to Defendants that

12   they were charged an initial interest rate higher than the sum of the index and margin in

13   December 2006, Defendants repeatedly represented to Mr. Weinstein over the next few

14   months that the initial interest rate was based on the sum of the index and margin and

15   that Mr. Weinstein came up with a discrepancy because he was using the wrong index

16   and margin.  Defendants' agents, Ms. Clayton and Mr. Beal, made these representations

17   knowing that they were false – and as their superiors would later admit, the initial

18   interest rate was never tied to the index.  Defendants intended Ms. Clayton and Mr.

19   Beal's statements to mislead Plaintiffs into thinking that the overcharge at issue was a

20   mere error, not a fraud, so that Plaintiffs would patiently wait for Defendants to correct

21   their mistake, instead of filing a lawsuit.  Plaintiffs were ignorant of the true state of

22   facts until May 2007, when Mr. Reuscher finally disclosed that the initial interest rate

23   was not based on any index after all.  Because Plaintiffs believed at the time of their

24   communications with Ms. Cox, Ms. Clayton and Mr. Beal that Defendants were

25   reputable companies who would not engage in dishonest or misleading conduct,

26   Plaintiffs justifiably relied on their representation that the initial interest rate was based

28   on the sum of the index or margin, and that the overcharge his discovered was merely a

mathematical error that Defendants would eventually correct and refund. Because Plaintiffs relied on Chase's misrepresentations, Plaintiffs were prevented from discovering Defendants' fraud until May 2007.

61.   **Plaintiffs assiduously pursued their claims after discovery:** Almost immediately after discovering that Defendants had defrauded them, Plaintiffs retained counsel who wrote letters to Defendants seeking a resolution of this dispute. Plaintiffs' counsel sent his first letter to Defendants in May 2007.

62.   Defendants' counsel eventually responded to Plaintiffs' counsel with the suggestion that the parties should mediate their dispute before filing in Court. Defendants' counsel suggested that the parties use the Hon. William J. Cahill (Ret.) as the mediator (who charges $10,000 per day), that the mediation occur in San Francisco, and that Defendants' would bring a high-level executive of Defendants from New York with adequate settlement authority to attend the mediation. Plaintiffs agreed to all of these terms. The mediation was delayed for six or eight months because Defendants' lawyers claimed that there was a delay in getting the high-level New York executive to attend the mediation. The mediation eventually occurred in San Francisco on February 27, 2008 at the offices of JAMS. The parties exchanged mediation briefs in advance describing their respective positions. To Plaintiffs' surprise at the mediation, there was no high-level executive from Defendants' New York offices with adequate settlement authority in attendance. The Plaintiffs hoped that through the mediation process they would render this action unnecessary or perhaps cheaper to resolve. Unfortunately, the case did not settle.

63.   The Plaintiffs searched diligently after the conclusion of the mediation for counsel who would be willing to take on the case against the formidable, well-funded Defendants. After eventually finding several lawyers who would take the case only if the workload were spread out among other lawyers, and after finding enough lawyers, Plaintiffs filed this action.

64.    Thus, Defendants had timely notice of Plaintiff's claims.  The Defendants have suffered no prejudice in gathering evidence to defend this action.  The Plaintiffs have acted at all times in good faith and reasonably in pursuing their claims first through mediation and second through this action.

## A CONSPIRACY EXISTED

65.    Plaintiffs allege the following paragraphs 65 through 74 on information and belief.  The facts pertaining to the conspiracy lie within Defendants' knowledge, and Defendants have concealed the formation, existence, and operation of the conspiracy from Plaintiffs and the general public.

66.    Defendant JPMORGAN CHASE BANK formed a conspiracy with CHASE MANHATTAN, which conspiracy continued with CHF LLC after CHASE MANHATTAN merged into CHF LLC, to defraud Plaintiffs and Class members by concealing the extra padding added to the initial interest rate in 3/1 and 5/1 adjustable-rate loans (at least, and possibly other loans as well).  As CHF LLC's indirect parent company, JPMORGAN CHASE BANK benefitted from the fraudulent scheme as did CHF LLC.

67.    The Defendants knew of the unlawful purpose of this conspiracy and carried it out nonetheless.  The Defendants further conspired with others whose identities are presently unknown to Plaintiffs, including officers and directors of Defendants.  These conspirators knowingly participated in and specifically directed and authorized committing the fraud herein alleged, acted for their own individual gain in doing so, and acted with knowledge of the scheme's unlawful purpose and with the intent to aid in its unlawful purpose.  The conspiracy including the goal to market adjustable rate loans to Plaintiffs and the Class Members in such a way that Plaintiffs and Class Members would be misled into believing that the initial interest rate that they would pay would be the sum of the index and the margin and to conceal the fact that the initial interest rate was higher than the sum of the index and the margin.  The Defendants and co-conspirators designed deliberately misleading "disclosure" documents and other communications with Plaintiffs and Class members with the goal to deceive them into believing that the initial interest rate on adjustable-rate loans was equal to the sum of the index and the margin when in fact it was higher.  The

conspiracy further included the goal of fraudulently concealing Plaintiffs' causes of action, by directing Defendants' employees to tell Plaintiffs that their rates were based on the index and margin when the rates were really based on secret factors unknown to Plaintiffs (as Mr. Reuscher finally admitted in his May 2, 2007 letter).

68.    The conspiracy was formed before Plaintiffs obtained their first loan with Defendants. The conspiracy operated to make loans by means of deceptive "disclosures" until within three years of the filing of this action (including when Defendant CHF LLC demanded full payment of Plaintiffs' loan in May 2007).

69.    Defendants and the (as yet) unidentified co-conspirators furthered the conspiracy by means of concealing material information about the initial interest rate in adjustable-rate loans as pleaded above in this Second Amended Complaint.

70.    Plaintiffs were damaged by the actions of these conspirators because they were misled into obtaining loans from Defendants that charged them a higher initial interest rate than the sum of the index and the margin. Plaintiffs reasonably believed that the initial interest rates that they were paying were equal to the sum of the index and the margin, and based upon this erroneous belief the Plaintiffs obtained loans from Defendants.

71.    At all relevant times and at places unknown to Plaintiffs and the Class members, as defined below, and known to said conspirators, Defendants JPMORGAN CHASE BANK and CHF LLC conspired and agreed with each of the others to defraud Plaintiffs and to otherwise engage in unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices in the manner and as herein described, and at all times mentioned, said Defendants, and each of them, were acting pursuant to, in furtherance of, and within the scope and purpose of said conspiracy.

72.    Various other individuals, partnerships, firms, and corporations, the identities of which are presently unknown, and who have not been named as Defendants in the Second Amended Complaint, have participated as co-conspirators

1  with the Defendants in the violations alleged herein, and have performed acts and made

2  statements in furtherance thereof.

3      73.    The acts charged in this Second Amended Complaint as having been done

4  by Defendants were authorized, ordered or done by their respective officers, agents,

5  employees or representatives while actively engaged in the management, direction, or

6  control of each Defendant's business or affairs.

7      74.    The acts charged in the Second Amended Complaint were done by each of

8  the co-conspirators, were fully authorized by each of those co-conspirators, or ordered

9  or done by duly authorized officers, agents, employees, or representatives of each co-

10  conspirator while actively engaged in the management, direction, or control of such co-

11  conspirator's business or affairs.

12

13          **THE DEFENDANTS' CONTINUING VIOLATIONS**

14      75.    The Defendants engaged in a continuing pattern of violating the rights of

15  Plaintiffs and Class members by collecting loans payments each month after making the

16  loans that were at an interest rate that had been deceitfully padded in the manner

17  alleged above.  The Defendants have continued accepted excessively high loan

18  payments, which were obtained by means of fraud, until at least 2007 and perhaps later.

19  The Defendants have also continued using the same deceptive (non)disclosure

20  documents that they used with Plaintiffs for other Class members until at least some

21  time in 2007.

22

23

24

25

26

28

**FIRST CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION**

**(Civ. Code §§ 1709, 1710(1))**

**(Against All Defendants)**

76.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

77.    Plaintiffs and the Class members were provided with and signed, and returned to CHASE MANHATTAN, standardized ARM Disclosures which represented to them that the initial interest rate in their corresponding promissory note evidencing the ARM Loan would be the sum of the interest rate based on a specified index and a margin to be specified in the ARM Note (or possibly a "discounted" initial interest rate).

78.    That was a lie. Or, as lawyers say, the foregoing representations made by CHASE MANHATTAN through its agents were false. In reality, the interest rates in the promissory notes were not the sum of the indexes identified in the respective disclosures plus a margin identified in the promissory notes. Rather, they were higher rates set according to a number of factors that CHASE MANHATTAN and its agents deliberately did not disclose to Plaintiffs and the Class members, including, but not limited to, competitor pricing for similar loan products, internal cost of funds, and customer creditworthiness. As a result of these false representations, the initial interest rates in the respective promissory notes were higher than the rates would have been had they been calculated as represented in the disclosure statements.

79.    Defendants made the foregoing misrepresentations to Plaintiffs and Class members knowing the same to be false, incomplete and misleading at the time they were made, or made them recklessly without knowing the truth or falsity of them, in an effort to induce Plaintiffs and the Class members to purchase ARM Loans from Defendants.

80.     When CHASE MANHATTAN made these representations, CHASE MANHATTAN knew them to be false and made these representations with the intention to deceive and defraud Plaintiffs and the Class members, and to induce Plaintiffs and Class members to act in reliance on these representations in the manner herein alleged, or with the expectation that Plaintiffs and Class members would so act.

81.     At the time CHASE MANHATTAN made its false representations and at the time Plaintiffs and the Class members took the actions alleged herein, Plaintiffs and the Class members were ignorant of the falsity of CHASE MANHATTAN's representations and believed them to be true and complete. In reliance upon these representations, Plaintiffs and the Class members were induced to, and did, enter into the ARM Loans with CHASE MANHATTAN. Had Plaintiffs and the Class members known the truth they would not have entered into these loans with CHASE MANHATTAN. Plaintiffs' and Class members' reliance on CHASE MANHATTAN's representations were justified because the fraudulent representations as to how the interest rate on their loans would be determined were made in disclosures required by law and Plaintiffs and the Class members believed that CHASE MANHATTAN was a trustworthy, reputable company.

82.     As a proximate result of CHASE MANHATTAN's fraudulent conduct as herein alleged, Plaintiffs and the Class members have incurred and will continue to incur damages in the amount of interest they were induced to pay which was greater than they would have paid had the interest rates been calculated in the manner that CHASE MANHATTAN had represented.

83.     Plaintiffs and the Class members lacked knowledge or suspicion that Defendants and their co-conspirators had misrepresented the formula for calculating the interest rate on their one-, three-, five-, seven-, and ten-year ARM Loans. Plaintiffs did not discover the falsity of Defendants' misrepresentations and concealment until within three years of the filing of this suit.

84.    Defendants increased the interest rate on Plaintiffs' loan to 5.875 percent. The "previous interest rate" was 3.875 percent, the "previous index" was 1.384 percent, and the "margin" was 2.25 percent (as set forth in the rate-change notice described in paragraph 59). These numbers don't add up. When added together, the Index for the previous period (1.384 percent) and the Margin (2.25 percent) equal (when rounded) only 3.625 percent. This figure is .25 percent less than the 3.875 percent interest rate that Defendants had charged under the 3/1 ARM note.

85.    Furthermore, because of the 2 percentage-point limitation on annual increases in the 3/1 ARM note, this interest rate increase should have been capped at 5.625 percent, instead of rising to 5.875 percent.

86.    The Defendants eventually admitted in May 2007 to Plaintiffs that the initial interest rate as specified in the 3/1 ARM Disclosure was based on factors that were never disclosed and were unknown to Plaintiffs and the Class members. Plaintiff Weinstein received Mr. Reusher's letter, referenced in paragraph 57 above, stating that "Chase" did not use the formula provided in its disclosures to determine the initial interest rate on Plaintiffs' loans. Rather, Chase based its "loan pricing" on such factors as competitor pricing, internal cost of funds, customer credit worthiness and other factors.

87.    The Defendants have never explained their basis for having used an initial Index of 1.384 percent. Through subsequent investigation, Plaintiffs discovered that this was the value of the LIBOR index as of February 25, 2003, which is also the date of the first 3/1 ARM Disclosure. Plaintiffs also discovered that as of May 13, 2003, which is the date of the 3/1 ARM Note, the value of the LIBOR index referenced in the 3/1 ARM Disclosure had dropped to 1.27 percent. The sum of 1.27 percent and the margin of 2.25 percent when rounded is 3.50 percent. In other words, the initial interest rate on the 3/1 ARM Note and its subsequent reset exceeded the formulas in the 3/1 ARM Disclosures by 0.375 percent.

88.    Plaintiffs estimate that based on the 3.875 percent initial interest rate, the first interest rate adjustment to 5.875 percent, and a second interest rate adjustment to 7.625 percent which was effective as of June 1, 2007, they paid $96,004 in interest on the 3/1 ARM Loan (including prepaid interest of $234). The 3/1 ARM Loan was paid in full on July 5, 2007. Had the initial interest rate been set at 3.50 percent, as required by the 3/1 ARM Disclosures and adjusted to 5.50 percent and 7.50 percent, respectively, as permitted by the 3/1 ARM Note, Plaintiffs ' interest payments would have totaled $89,882. Hence, Plaintiffs paid approximately $6,142 more interest than the amount they should have paid based upon the 3/1 ARM Disclosures. In addition Plaintiffs paid $2,660 in closing costs, exclusive of prepaid interest. Of this amount, CHASE MANHATTAN got $642.

89.    The disclosures concerning the 3/1 ARM Loan caused Plaintiffs to investigate in May 2007 the interest they were charged on a 5/1 ARM Loan that they had obtained from the Defendants in October 2001. As a result of their investigation, Plaintiffs discovered that they had also been overcharged for interest on this loan.

90.    Because the Defendants fraudulently concealed how the initial interest rates for these ARM loans were really calculated, and fraudulently concealed Plaintiffs' cause of action from December 2006 to May 2007 (as alleged in more detail below), Plaintiffs and the Class members did not discover the fraudulent acts until and/or continued making payments on the fraudulent loans within three years of the filing of the Complaint in this action.

91.    Plaintiffs and the Class members are informed and believe and thereon allege that Defendants and their co-conspirators have been committing continuing overt acts in furtherance of their conspiracy to conceal their fraud, including the collection of monthly installment payments of principal and interest on the fraudulent loans made by them until within three years of the filing of this suit.

92.    The aforementioned conduct of CHASE MANHATTAN, which is the predecessor of CHF LLC, constitutes an intentional misrepresentation, deceit or concealment of material facts known to CHASE MANHATTAN with the intent of depriving Plaintiffs and the Class members of their property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiffs and the Class members to a cruel and unjust hardship in conscious disregard of Plaintiffs' and Class members' rights, so as to justify an award of exemplary and punitive damages.

93.    On May 8, 2007, Plaintiffs' counsel wrote to Defendants on Plaintiffs' behalf and exercised their right to rescind the transaction.  On June 11, 2007, Chase wrote to Plaintiff's counsel and stated that "Chase will not agree to your demand to rescind the current loan…"  Nonetheless in July 2007, Plaintiffs tendered and Defendants accepted full repayment of the entire loan amount.  Defendants have refused, however, to return to Plaintiffs everything of value that they received from Plaintiffs.

## SECOND CAUSE OF ACTION FOR CONCEALMENT
### (Civ. Code § § 1709, 1710(3))
### (Against All Defendants)

94.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

95.    In violation of its legal duty to Plaintiffs and the Class members, CHASE MANHATTAN suppressed and failed to reveal the fact that the initial interest rates specified in the Notes would be calculated in a manner different from that set out in the respective loan disclosure statements, and would instead be based on factors other than the sums of the respective indexes and margins.

96.    The representations and failures to disclose information and suppressions of information herein alleged to have been made by CHASE MANHATTAN were

1  made with the intent to induce Plaintiffs and the Class members to act in the manner
2  herein alleged in reliance thereon.

3      97.    At the time these failures to disclose and suppressions of facts occurred,
4  and at the time the Plaintiffs and the Class members took the actions herein alleged,
5  Plaintiffs and the Class members were ignorant of the existence of the facts that
6  CHASE MANHATTAN had suppressed and failed to disclose.  Had Plaintiffs and the
7  Class members been aware of the existence of the facts not disclosed by CHASE
8  MANHATTAN, Plaintiffs and Class members would not have entered into these loans
9  with CHASE MANHATTAN.

10     98.    As a proximate result of CHASE MANHATTAN's fraudulent conduct as
11 herein alleged, Plaintiffs and the Class members have incurred and will continue to
12 incur damages in the amount of interest they were induced to pay which was greater
13 than they would have paid had the initial interest rates been calculated in the manner
14 that CHASE MANHATTAN had represented to Plaintiffs.

15     99.    Furthermore, Plaintiffs and the Class members are informed and believe
16 and thereon allege that at all relevant times until the present, Defendants and their co-
17 conspirators have been committing continuing overt acts in furtherance of the
18 conspiracy including the collection of monthly installment payments of principal and
19 interest on the fraudulent loans made by them.

20     100.   The aforementioned conduct of CHASE MANHATTAN, which is the
21 predecessor of CHF LLC, was an intentional misrepresentation, deceit or concealment
22 of a material fact known to CHASE MANHATTAN with the intention of, on the part of
23 CHASE MANHATTAN of thereby depriving Plaintiffs and the Class members of their
24 property or legal rights or otherwise causing injury, and was despicable conduct that
25 subjected Plaintiffs and the Class members to a cruel and unjust hardship in conscious
26 disregard of Plaintiffs' and Class members' rights, so as to justify an award of
28 exemplary and punitive damages.

## THIRD CAUSE OF ACTION FOR PROMISE MADE WTHOUT INTENT TO
## PERFORM

### (Civ. Code § § 1709, 1710(4))

### (Against All Defendants)

101.   Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

102.   CHASE MANHATTAN promised to Plaintiffs and the Class members that the initial interest rates in the ARM Notes would be the sum of the indexes disclosed in the respective loan disclosure statements and the margins specified in the notes.

103.   At the time CHASE MANHATTAN made this promise to Plaintiffs and the Class members, it had no intention of performing it and failed to perform it.

104.   The aforementioned promises were made by CHASE MANHATTAN with the intent to induce Plaintiffs and the Class members to enter into ARM Loans with CHASE MANHATTAN.

105.   Plaintiffs and Class members, at the time this promise was made and at the time Plaintiffs and Class members took the actions herein alleged, were ignorant of CHASE MANHATTAN's secret intention not to perform and reasonably relied on CHASE MANHATTAN's disclosures concerning how the initial interest rates on the loans would be determined, and could not, in the exercise of reasonable diligence, have discovered CHASE MANHATTAN's secret intention. In reliance on the promises of CHASE MANHATTAN, Plaintiffs and the Class members entered into the ARM Loans. If the Plaintiffs and the Class members had known of the actual intention of CHASE MANHATTAN not to perform the aforementioned promises, Plaintiffs and the Class members would not have taken such action at the time these failures to disclose and suppressions of facts occurred.  At the time the Plaintiffs and the Class members took the actions herein alleged, they were ignorant of the existence of the facts that

1  CHASE MANHATTAN had suppressed and failed to disclose. Had Plaintiffs and the
2  Class members been aware of the existence of the facts not disclosed by CHASE
3  MANHATTAN, Plaintiffs and the Class members would not have entered into the
4  ARM Loans.

5      106.  As a proximate result of CHASE MANHATTAN's fraudulent conduct as
6  herein alleged, Plaintiffs and the Class members have incurred and will continue to
7  incur damages in the amount of interest they were induced to pay which was greater
8  than they would have paid had the initial interest rates been calculated in the manner
9  that CHASE MANHATTAN had represented to Plaintiffs.

10      107.  Furthermore, Plaintiffs and the Class members are informed and believe
11  and thereon allege that at all relevant times until the present, Defendants and their co-
12  conspirators have been committing continuing overt acts in furtherance of the
13  conspiracy including the collection of monthly installment payments of principal and
14  interest on the fraudulent loans made by them.

15      108.  The aforementioned conduct of CHASE MANHATTAN, the predecessor
16  of CHF LLC, was an intentional misrepresentation, deceit or concealment of a material
17  fact known to CHASE MANHATTAN with the intention of, on the part of CHASE
18  MANHATTAN, of thereby depriving Plaintiffs and the Class members of their
19  property or legal rights or otherwise causing injury, and was despicable conduct that
20  subjected Plaintiffs and the Class members to a cruel and unjust hardship in conscious
21  disregard of Plaintiffs' and Class members' rights, so as to justify an award of
22  exemplary and punitive damages.

23
24
25
26
28

# FOURTH CAUSE OF ACTION FOR RESCISSION BASED ON FRAUD OR MISTAKE

## (Civ. Code § § 1689(b)(1))

### (Against All Defendants)

109. Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

110. The consent of the Plaintiffs and the Class members to the above-described loan transactions was given by mistake or obtained through fraud, exercised by or with the connivance of the Defendants. The Plaintiffs would not have consented to these loans with Defendants if they had known that their initial interest rate was not the sum of the index and the margin but in fact was higher.

111. The Plaintiffs are entitled to rescind their transactions with Defendants.

# FIFTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION OF FACT

## (Civ. Code § § 1709, 1710(2))

## (Against All Defendants)

112.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

113.    Plaintiffs and the Class members were provided with and signed, and returned to CHASE MANHATTAN, standardized ARM Disclosures which represented to them that the initial interest rate in their corresponding promissory note evidencing the ARM Loan would be the sum of the interest rate based on a specified index and a margin to be specified in the ARM Note.

114.    The foregoing representations made by CHASE MANHATTAN through its agents were false.  In reality, the interest rates in the promissory notes were not the sum of the indexes identified in the respective disclosures plus a margin identified in the promissory notes.  Rather, they were rates set with regard to a number of factors that CHASE MANHATTAN and its agents deliberately did not disclose to Plaintiffs and the Class members, including, but not limited to:  competitor pricing for similar loan products, internal cost of funds, and customer creditworthiness.  As a result of these false representations, the initial interest rates in the respective promissory notes were higher than the rates would have been had they been calculated as represented in the disclosure statements.

115.    Defendants made the foregoing misrepresentations to Plaintiffs and Class members with no reasonable ground for believing them to be true in an effort to induce Plaintiffs and the Class members to purchase ARM Loans from Defendants, or with the expectation that Plaintiffs and Class members would so act.

116.    When CHASE MANHATTAN made these representations they knew them to be false and made these representations with the intention to deceive and

1 defraud Plaintiffs and the Class members, and to induce Plaintiffs and Class members

2 to act in reliance on these representations in the manner herein alleged, or with the

3 expectation that Plaintiffs and Class members would so act.

4     117.  At the time CHASE MANHATTAN made its false representations and at

5 the time Plaintiffs and the Class members took the actions alleged herein. Plaintiffs and

6 the Class members were ignorant of the falsity of CHASE MANHATTAN's

7 representations and believed them to be true and complete.  In reliance upon these

8 representations. Plaintiffs and the Class members were induced to and did enter into the

9 ARM Loans with CHASE MANHATTAN.  Had Plaintiffs and the Class members

10 known the truth they would not have entered into these loans with CHASE

11 MANHATTAN.  Plaintiffs' and Class members' reliance on CHASE MANHATTAN's

12 representations were justified because the fraudulent representations as to how the

13 interest rate on their loans would be determined were made in disclosures required by

14 law and Plaintiffs and the Class members believed that CHASE MANHATTAN was a

15 trustworthy, reputable company.

16     118.  As a proximate result of CHASE MANHATTAN's fraudulent conduct as

17 herein alleged, Plaintiffs and the Class members have incurred and will continue to

18 incur damages in the amount of interest they were induced to pay which was greater

19 than they would have paid had the initial interest rates been calculated in the manner

20 that CHASE MANHATTAN had represented.

## SIXTH CAUSE OF ACTION FOR RESTITUTION AND INJUNCTION FOR VIOLATION OF THE UNFAIR COMPETITION ACT

### (Bus. & Prof. Code §§ 17200 *et seq.)*

### (Against All Defendants)

119.   Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

120.   Beginning on a date presently unknown to Plaintiffs, Defendants committed and continue to commit acts of unfair competition, as defined by Bus. & Prof. Code §§ 17200 *et seq.*, by engaging in the acts and practices specified in the paragraphs above.

121.   This Second Amended Complaint is filed and these proceedings are instituted pursuant to Bus. & Prof. Code §§ 17203 and 17204 to obtain restitution from these Defendants for acts, as alleged herein, that violated Bus. & Prof. Code §§ 17200 *et seq.*, commonly known as the Unfair Competition Act.

122.   Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted and constitute a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of Bus. & Prof. Code §§ 17200 *et seq.* including, but not limited to, the following:

a.   Defendants knowingly and recklessly made material misstatements of fact or omissions in violation of Section 50503(a)(2) of the California Residential Mortgage Lending Act, Fin. Code §50000 *et seq.;*

b.   Defendants defrauded Plaintiffs in violation of Civ. Code §§1709 and 1710 while engaging in the business activity of originating residential mortgage loans;

c.  Defendants' acts, omissions, misrepresentations, practices and non-disclosures as described in the paragraphs above violate the Real Estate Settlement Procedures Act, 12 U.S.C. §2601, *et seq*. and Regulation X, 24 C.F.R. §3500;

d.  Defendants' acts, omissions, misrepresentations, practices and non-disclosures as described in the paragraphs above violate the Truth in Lending Act, 15 U.S.C.,§1601, *et seq*. and Regulation Z, 12 C.F.R. § 226;

e.  Defendants' acts, omissions, misrepresentations, practices and non-disclosures as described in the paragraphs above are unfair, unconscionable, unlawful or fraudulent;

f.  Defendants' acts and practices are unfair to consumers of mortgages in the State of California, within the meaning of Bus. & Prof. Code §§ 17200 *et seq*.; and

g.  Defendants' acts and practices are fraudulent and/or deceptive within the meaning of Bus. & Prof. Code §§ 17200 *et seq*.

123.  Plaintiffs and each of the Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business acts or practices.

124.  The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

125.  The unlawful and unfair business practices of Defendants, and each of them, as described above, have injured and present a continuing threat of injury to members of the public in that Defendants' conduct has caused and continues to cause Plaintiffs and Class members to pay artificially inflated interest rates on ARM Loans and has made it likely that members of the public will continue to be deceived with respect to the manner in which the interest rates for ARM Loans have been set.

Defendants should also be permanently enjoined from any continuing violations of Bus. & Prof. Code §§ 17200 *et seq.*

126.    The conduct of Defendants as alleged in this Second Amended Complaint violates Bus. & Prof. Code §§ 17200 *et seq.*

127.    As alleged in this Second Amended Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and Class members are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to Bus. & Prof. Code §§ 17203 and 17204.

128.    As a direct, proximate, and foreseeable result of Defendants' fraudulent and unlawful business practices, as alleged above, Plaintiffs and the Class members were required to pay substantially more interest on the ARM Loans originated by Defendants than had the interest rates for these loans been calculated in the manner described in the ARM Disclosures.

129.    Furthermore, Plaintiffs and the Class members are informed and believe and thereon allege that within four years of the filing of this Second Amended Complaint until the present, Defendants and their co-conspirators have been committing continuing overt acts in furtherance of the conspiracy including the collection of monthly installment payments of principal and interest on the fraudulent loans made by them.

## SEVENTH CAUSE OF ACTION FOR UNJUST ENRICHMENT

### (Against All Defendants)

130.   Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

131.   As a result of the conduct of Defendants as alleged above, Defendants and each of them have been unjustly enriched at the expense of Plaintiffs and the Class members and the law thereby implies a contract by which Defendants must pay to Plaintiffs the amount by which, in equity and good conscience, the Defendants have been unjustly enriched at the expense of Plaintiffs.

1          **PRAYER FOR RELIEF**

2          WHEREFORE, Plaintiffs, on behalf of themselves and the Class members, pray

3   for judgment against Defendants as set forth below:

4          1.     Determining that this action may proceed and be maintained as a class

5   action and appointing the Plaintiffs and their counsel to represent the Class members;

6          2.     For an Order rescinding the transactions between the Defendants, on the

7   one hand, and the Plaintiffs and Class members, on the other hand, such that each side

8   ordered to restore to the other party everything of value received under the contracts to

9   the other party, upon condition that such other party shall do likewise, and/or for

10  compensatory damages according to proof.  To the extent that rescission and damages

11  are inconsistent remedies, Plaintiff seeks both and to the extent required will make an

12  election between inconsistent remedies after all the facts have been placed before the

13  court;

14         3.     For punitive damages to be determined at trial according to the relative

15  culpability, net worth, income and financial resources of each Defendant;

16         4.     For reasonable attorney's fees;

17         5.     For an Order adjudging and deeming Defendants to have committed acts

18  of unfair competition in violation of Bus. & Prof. Code §§ 17200 *et seq.*;

19         6.     For an Order that Defendants, and each of them, their agents, servants and

20  employees, and all persons acting, directly or indirectly, in concert with them, must

21  restore to Plaintiffs and each member of the Class all money or property given by

22  Plaintiffs and Class members to anyone, including Defendants, in connection with the

23  transactions that are the subject of this Second Amended Complaint or otherwise

24  acquired by means of any act or practice declared by this Court to be unfair,

25  unconscionable, unlawful or fraudulent, or to otherwise constitute unfair competition

26  under Bus. & Prof. Code §§ 17200 *et seq.*;

28

7.    For an Order enjoining and restraining Defendants from continuing, maintaining or renewing each and every act and practice declared to be unfair, unconscionable, unlawful or fraudulent, or to otherwise constitute unfair competition under Bus. & Prof. Code §§ 17200 *et seq.*;

8.    For restitution and disgorgement of Defendants' ill-gotten gains;

9.    For costs of suit; and

10.    For such other and further relief as the Court may deem just and proper.

11.    Plaintiffs and the Class members hereby respectfully demand a trial by jury of all issues so triable.

Dated:  January 18, 2012                    **Blum | Collins LLP**

                                            /s/Craig M. Collins

                                            _____
                                            **CRAIG M. COLLINS**
                                            Attorney for Plaintiffs


Dated: January 18, 2012                     **PETERSON LAW GROUP
                                            PROFESSIONAL CORPORATION**

                                            /s/John S. Peterson

                                            _____
                                            **JOHN S. PETERSON**
                                            Attorney for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury to the extent permitted by law.

Dated:  January 18, 2012

Blum | Collins LLP

/s/Craig M. Collins

CRAIG M. COLLINS
Attorney for Plaintiffs

Dated: January 18, 2012

PETERSON LAW GROUP
PROFESSIONAL CORPORATION

/s/John S. Peterson

JOHN S. PETERSON
Attorney for Plaintiffs

## INDEX OF EXHIBITS

A   5/1 ARM Disclosure

B   3/1 ARM Disclosure

C   Fixed/Adjustable Rate Note

D   Fixed/Adjustable Rate Rider

# EXHIBIT A

# EXHIBIT A

 CHASE

| | |
|---|---|
| **5/1, 7/1 and 10/1 NON-CONVERTIBLE**<br>**FIXED/ADJUSTABLE RATE LOAN DISCLOSURE**<br>(NON-CONSTRUCTION) | 27601309<br>1276013094 |

The information contained in this ARM disclosure relates to:

Applicant's Name:  STEVEN L WEINSTEIN
BARBARA L SCHRAMM

Property Address:                                                          Loan Amount:    460,000.00
   5101 CROCKETT PLACE, OAKLAND, CA 94602
LENDER:
   CHASE MANHATTAN MORTGAGE CORPORATION

**THIS DISCLOSURE DESCRIBES THE FEATURES OF THE ADJUSTABLE RATE MORTGAGE ("ARM") LOAN PROGRAM OFFERED BY LENDER IN WHICH YOU HAVE EXPRESSED AN INTEREST. DISCLOSURES ON OTHER ARM PROGRAMS OFFERED BY LENDER ARE AVAILABLE UPON REQUEST.**

A Consumer Handbook is also provided to you by Lender. It provides you with additional information about Adjustable Rate Mortgages.

This disclosure statement is not a contract and does not constitute a commitment on the part of Lender to make a loan to you.

I.    INTEREST RATE

   A.  How Your Interest Rate Is Determined

      Your interest rate will be based on the weekly average yield on United States Treasury securities adjusted to a constant maturity of 1 year (the "Index") plus an amount called a "Margin." Ask us for our current Margin and interest rate. Information about the Index is published weekly in Federal Reserve Board Statistical Release H.15 (519) and in the *Wall Street Journal*. The Index and the Margin will be specified in the promissory note (the "Note") which evidences your ARM loan.  If at some point in the future this Index is no longer available, Lender will use an alternative Index which is based on information Lender believes to be comparable.
      The interest rate you will pay until the first Rate Change Date is called the "Initial Interest Rate."

   B.  How Your Interest Rate Can Change

      Your interest rate can be adjusted up or down yearly, based on movements, if any, in your Index.  The date each year on which your interest rate can be adjusted is called a "Rate Change Date".  Your first Rate Change Date will occur on:

      5/1    the first day of the 61st full month after your loan closing.
      7/1    the first day of the 85th full month after your loan closing.
      10/1   the first day of the 121st full month after your loan closing.

   Subsequent Rate Change Dates will occur on the first day of every 12th calendar month thereafter.
      Approximately 45 days before each Rate Change Date, your new interest rate will be determined by adding the Margin to the then-current Index. This sum will be rounded to the nearest 1/8 of 1%.
      Your interest rate cannot increase or decrease by more than three percentage points (3.0%) on the First Rate Change Date and will not increase or decrease by more than two percentage points ( 2.0% ) at any subsequent Rate Change Date.  In addition, your interest rate over the life of the loan cannot increase by more than five percentage points ( 5.0% ) over your Initial Interest Rate and cannot decrease below the margin.

      Your Initial Interest Rate may be discounted and will not be tied to the Index. It will be adjusted to the sum of the then-current Index plus the Margin at the first Rate Change Date, subject to the interest rate caps explained above. Ask us about the amount of the current interest rate discount.

II.    PAYMENT

   A.  How Your Monthly Payment Is Determined

      Your payment will be based on the interest rate, loan balance, and remaining loan term. Your initial payment will be set at an amount which will fully pay the accruing monthly interest at the Initial Interest Rate and reduce the principal so as to pay off the outstanding loan balance by the end of the loan term in equal monthly installments.

**B.  How Your Monthly Payment Can Change**

After your first Rate Change Date your monthly payment can increase or decrease substantially every twelve months based on changes in the interest rate. Your monthly payment will be changed to an amount that will fully pay the accruing monthly interest and reduce the principal so as to pay off the outstanding loan balance by the end of the loan term in equal monthly installments at the then-applicable interest rate. Your new payment amount will be due on the first monthly payment date after a Rate Change Date.

5/1 example: On a $10,000, 30-year loan with an initial interest rate of 8.5 percent in effect in July 2000, the maximum amount that the interest rate can rise under this program is 5 percentage points, to 13.5 percent, and the monthly payment can rise from $76.89 for the first five years to a maximum of $111.07 in the seventh year.  To see what your payment is, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount.  (For example, the monthly payment for a mortgage amount of $60,000 would be:  $60,000 ÷ $10,000 = 6, 6 x $76.89 = $461.34 per month.)

7/1 example: On a $10,000, 30-year loan with an initial interest rate of 8.375 percent in effect in July 2000, the maximum amount that the interest rate can rise under this program is 5 percentage points, to 13.375 percent, and the monthly payment can rise from $76.01 for the first seven years to a maximum of $108.40 in the ninth year.  To see what your payment is, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount.  (For example, the monthly payment for a mortgage amount of $60,000 would be:  $60,000 ÷ $10,000 = 6, 6 x $76.01 = $456.06 per month.)

10/1 example: On a $10,000, 30-year loan with an initial interest rate of 8.750 percent in effect in July 2000, the maximum amount that the interest rate can rise under this program is 5 percentage points, to 13.750 percent, and the monthly payment can rise from $78.67 for the first ten years to a maximum of $108.75 in the twelfth year.  To see what your payment is, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount.  (For example, the monthly payment for a mortgage amount of $60,000 would be:  $60,000 ÷ $10,000 = 6, 6 x $78.67 = $472.02 per month.)

You will be notified in writing at least 25 but not more than 120 calendar days before each payment adjustment will be made. This notice will contain information about your Index, interest rate, payment amount, loan balance, and the date on which your first payment is due at the new amount.

## APPLICANT ACKNOWLEDGEMENTS

You acknowledge that you must qualify for the proposed loan. Should you not qualify, your loan will not be approved to close.

You and Lender become bound to the terms of the Note and Security Instrument upon signing these documents. Although either party subsequently may request modification of the contract, neither party is bound to agree to such a request. Since the Note and Security Instrument establish your rights, you should understand and become familiar with the provisions of these documents.

After having read the contents of the above ARM Disclosure, you acknowledge receipt of a copy of this ARM Disclosure and further acknowledge that this ARM Disclosure was completed in full prior to its receipt. You also acknowledge receipt of the Consumer Handbook on Adjustable Rate Mortgages.

| STEVEN L WEINSTEIN | (Date) | BARBARA L SCHRAMM | (Date) |
|---|---|---|---|
|  | (Date) |  | (Date) |
|  | (Date) |  | (Date) |
|  | (Date) |  | (Date) |

Lender Representative            (Date)

EXHIBIT B

# EXHIBIT B



## 1/1 & 3/1 - NON-CONVERTIBLE
### ARM DISCLOSURE
(NON-CONSTRUCTION)

The information contained in this ARM disclosure relates to: 513    3/1 LIBOR NON CONFORMIN

Applicant's Name: **Steven L Weinstein   Barbara L Schramm**

Property Address: **5101 Crockett Place**                              Loan Amount: $ 560,000
**Oakland, CA  94602       County: ALAMEDA**

LENDER: **Chase Manhattan Mortgage Corporation**

**THIS DISCLOSURE DESCRIBES THE FEATURES OF THE ADJUSTABLE RATE MORTGAGE ("ARM") LOAN PROGRAM OFFERED BY LENDER IN WHICH YOU HAVE EXPRESSED AN INTEREST. DISCLOSURES ON OTHER ARM PROGRAMS OFFERED BY LENDER ARE AVAILABLE UPON REQUEST.**

A Consumer Handbook is also provided to you by Lender. It provides you with additional information about Adjustable Rate Mortgages.

This disclosure statement is not a contract and does not constitute a commitment on the part of Lender to make a loan to you.

I.    **INTEREST RATE**

   A.  **How Your Interest Rate Is Determined**

   Your interest rate will be based on the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR" or the "Index") plus an amount called a "Margin." Ask us for our current Margin and interest rate. Information about the Index is published in the *Wall Street Journal*. The Index and Margin will be specified in the promissory note (the "Note") which evidences your ARM loan. If at some point this Index is no longer available, the Lender will use an alternative Index which is based on information the Lender believes to be comparable. The interest rate you will pay until the first Rate Change Date is called the Initial Interest Rate.

   B.  **How Your Interest Rate Can Change**

   Your interest rate can be adjusted up or down yearly, based on movements, if any, in your Index. The date each year on which your interest rate can be adjusted is called a "Rate Change Date". Your first Rate Change Date will occur on:

   1/1     the first day of the thirteenth (13th) month after your loan closing
   3/1     the first day of the thirty-seventh (37th) month after your loan closing

Subsequent Rate Change Dates will occur on the first day of every 12th calendar month thereafter.
   Approximately 45 days before each Rate Change Date, your new interest rate will be determined by adding the Margin to the then-current Index. This sum will be rounded to the nearest 1/8 of 1%.
   Your interest rate cannot increase or decrease by more than two percentage points ( 2.0% ) at any Rate Change Date. In addition, your interest rate over the life of the loan cannot increase by more than six percentage points ( 6.0% ) over your Initial Interest Rate and cannot decrease below the margin.

   Your Initial Interest Rate may be discounted and will not be tied to the Index. It will be adjusted to the sum of the then-current Index plus the Margin at the first Rate Change Date, subject to the interest rate caps explained above. Ask us about the amount of the current interest rate discount.

II.   **PAYMENT**

   A.  **How Your Monthly Payment Is Determined**

   Your payment will be based on the interest rate, loan balance, and remaining loan term. Your initial payment will be set at an amount which will fully pay the accruing monthly interest at the Initial Interest Rate and reduce the principal so as to pay off the outstanding loan balance by the end of the loan term in equal monthly installments.

   B.  **How Your Monthly Payment Can Change**

   After your first Rate Change Date your monthly payment can increase or decrease substantially every twelve months based on changes in the interest rate. Your monthly payment will be changed to an amount that will fully pay the accruing monthly interest and reduce the principal so as to pay off the outstanding loan balance by the end of the loan term in equal monthly installments at the then-applicable interest rate. Your new payment amount will be due on the first monthly payment date after a Rate Change Date.

**EXHIBIT "B"**
**-46-**

**1/1 example:** On a $10,000, 15 year loan with an initial interest rate of 6.125 percent in effect in May 2002, the maximum amount that the interest rate can rise under this program is 6 percentage points to 12.125 percent, and the monthly payment can rise from $85.06 for the first year to a maximum of $116.73 in the fourth year. To see what your payment is, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000 would be: $60,000 ÷ $10,000 = 6, 6 x $85.06 = $510.36 per month.)

On a $10,000, 30-year loan with an initial interest rate of 6.125 percent in effect in May 2002, the maximum amount that the interest rate can rise under this program is 6 percentage points to 12.125 percent, and the monthly payment can rise from $60.76 for the first year to a maximum of $102.21 in the fourth year. To see what your payment is, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000 would be: $60,000 ÷ $10,000 = 6, 6 x 60.76 = $364.56 per month).

**3/1 example:** On a $10,000, 15 year loan with an initial interest rate of 6.375 percent in effect in May 2002, the maximum amount that the interest rate can rise under this program is 6 percentage points to 12.375 percent, and the monthly payment can rise from $86.43 for the first three years to a maximum of $113.90 in the sixth year. To see what your payment is, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000 would be: $60,000 ÷ $10,000 = 6, 6 x $86.43 = $518.58 per month.)

On a $10,000, 30-year loan with an initial interest rate of 6.375 percent in effect in May 2002, the maximum amount that the interest rate can rise under this program is 6 percentage points to 12.375 percent, and the monthly payment can rise from $62.39 for the first three years to a maximum of $102.26 in the sixth year. To see what your payment is, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000 would be: $60,000 ÷ $10,000 = 6, 6 x 62.39 = $374.34 per month).

You will be notified in writing at least 25 but not more than 120 calendar days before each payment adjustment will be made. This notice will contain information about your Index, interest rate, payment amount, loan balance, and the date on which your first payment is due at the new amount.

## APPLICANT ACKNOWLEDGEMENTS

You acknowledge that you must qualify for the proposed loan. Should you not qualify, your loan will not be approved to close.

You and Lender become bound to the terms of the Note and Security Instrument upon signing these documents. Although either party subsequently may request modification of the contract, neither party is bound to agree to such a request. Since the Note and Security Instrument establish your rights, you should understand and become familiar with the provisions of these documents.

After having read the contents of the above ARM Disclosure, you acknowledge receipt of a copy of this ARM Disclosure and further acknowledge that this ARM Disclosure was completed in full prior to its receipt. You also acknowledge receipt of the Consumer Handbook on Adjustable Rate Mortgages.

| | |
|---|---|
| _Steven L. Weinstein_   MAR 1 5 2003 | _Barbara L. Schramm_   MAR 1 5 2003 |
| Steven L. Weinstein        (Date) | Barbara L. Schramm          (Date) |
| _____        (Date) | _____          (Date) |
| _____        (Date) | _____          (Date) |
| _Larry Martinez_   2/25/03 | |
| Lender Representative        (Date) | |
| Larry Martinez | |

LIBOR DISCLOSURE- ARM 1/1 & 3/1 Non-Convertible
C-7784 (5/02)   Page 2 of 2

**EXHIBIT "B"**
**-47-**

EXHIBIT C

# EXHIBIT C

CMT NON-CONVERT 5/1                                                        27601309
1276013094

# FIXED/ADJUSTABLE RATE NOTE

### (One-Year Treasury Index - Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

October 12, 2001                ALAMEDA                         CA
[Date]                          [City]                          [State]

5101 CROCKETT PLACE, OAKLAND, CA 94602
[Property Address]

### 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   460,000.00      (this amount is called "Principal"), plus interest, to the order of Lender. Lender is CHASE MANHATTAN MORTGAGE CORPORATION
A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF
THE STATE OF NEW JERSEY
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.    INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.000      %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.    PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on  December 01, 2001
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  November 01, 2031   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
200 OLD WILSON BRIDGE ROAD, WORTHINGTON, OH 43085
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $    2,757.93    . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of
November 2006   , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - ONE-YEAR TREASURY INDEX - Single Family - Fannie Mae UNIFORM INSTRUMENT



**EXHIBIT "C"**
**-48-**

The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and Three-Quarters percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.000 % or less than 3.000 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.000 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Form 3522 1/01

Initials: _____

**EXHIBIT "C"**
**-49-**

7.  **BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  FIFTEEN  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  6.000  % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8.  **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.  **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.  **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.  **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

---

Form 3522 1/01

-843N (0005)                     Page 3 of 5                     Initials: _____

**EXHIBIT "C"**

**-50-**

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials:

EXHIBIT "C"

-51-

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
STEVEN L WEINSTEIN                -Borrower
Social Security No.: 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

_____ (Seal)
BARBARA L SCHRAMM                 -Borrower
Social Security No.: 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

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

*[Sign Original Only]*

VMP-843N (0005)

Form 3522 1/01

**EXHIBIT "C"**
**-52-**

EXHIBIT D

# EXHIBIT D

27601309
1276013094

CMT NON-CONVERT 5/1 ARM

# FIXED/ADJUSTABLE RATE RIDER
### (One-Year Treasury Index - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 12th day of October, 2001, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to

CHASE MANHATTAN MORTGAGE CORPORATION

("Lender") of the same date and covering the property described in the Security Instrument and located at:

5101 CROCKETT PLACE, OAKLAND, CA 94602

[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of 6.000 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:
## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of November 2006, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - ONE-YEAR TREASURY INDEX- Single Family - Fannie Mae Uniform Instrument

ⓂP -843R (0006)     Form 3182 1/01
Page 1 of 4     Initials:_____
VMP MORTGAGE FORMS - (800)521-7291

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and Three-Quarters                                             percentage points ( 2.750        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125 %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.000        % or less than           3.000         %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than           11.000    %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Initials:_____

**EXHIBIT "D"**

**-54-**

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all

Initials:_____

VMP-843R (0006)                    Page 3 of 4                    Form 3182 1/01

sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)                    _____ (Seal)
STEVEN L WEINSTEIN            -Borrower                                               -Borrower


_____ (Seal)                    _____ (Seal)
BARBARA L SCHRAMM            -Borrower                                                -Borrower


_____ (Seal)                    _____ (Seal)
                             -Borrower                                               -Borrower


_____ (Seal)                    _____ (Seal)
                             -Borrower                                               -Borrower


VMP-843R (0006)                    Page 4 of 4                    Form 3182 1/01

**EXHIBIT "D"**
**-56-**